In re SALEM SUEDE, INC., Debtor.

In re ZION REALTY CORP., Debtor.

Bankruptcy Nos. 96–13184–
JNF, 96–14692–JNF.

United States Bankruptcy Court,
D. Massachusetts.

March 18, 1998.

Stephen F. Gordon, Peter J. Haley, Boston, MA, for Debtors.

M. Ellen Carpenter, Boston, MA, for Chapter 11 Trustee.

Edward A. McCable, Boston, MA, for Judgment Creditors.

Paula R.C. Bachtell, Boston, MA, for U.S. Trustee.

John Nadas, Boston, MA, for Travelers Indemnity Company.

Joel B. Rosenthal, Boston, MA, for Eastern Bank.

Jeffrey A. Schreiber, Danvers, MA, for Creditors' Committee.

Kevin J. Simard, Boston, MA, for United Leather.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The amalgam of complex legal issues and human emotion permeating these Chapter 11 cases has culminated in this dispute between Salem Suede, Inc. ("Salem Suede") and Zion

Realty Corp. ("Zion")(collectively, the "Debtors"), on the one hand, and the Judgment Creditors, on the other, over confirmation of the Debtors' Second Amended Joint Plan of Reorganization.[1] The Judgment Creditors, Stefano Picciotto, Judith Picciotto, Juan Nunez and Foreign Car Center, Inc. (the "Judgment Creditors"), and the United States Trustee have filed objections to confirmation of the Second Amended Plan. The Court scheduled a confirmation hearing for February 12, 1998. At the conclusion of the hearing, the Court directed the parties to file memoranda of law on the issue of whether the Second Amended Plan meets the requirements for confirmation under 11 U.S.C. § 1129,[2] and in particular, whether confirmation should be denied in view of the provisions of 11 U.S.C. § 524(e)("... discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity, for such debt"), where the Plan provides for payment of 100% of the Judgment Creditors' claims against the Debtors from a trust to be funded by the Debtors' insurer, on the condition that the Judgment Creditors deliver a release of all their claims against the insurer and joint tortfeasors, who appear to be affiliates or insiders of the Debtors. The parties have complied with the Court's order.[3] The facts necessary to decide the legal issues presented are not in dispute. The Court now makes the following findings of fact and conclusions of law in accordance with Fed. R. Bankr.P. 7052.

## II. FACTS

The Debtors filed their Second Amended Disclosure Statement (the "Disclosure Statement") and Second Amended Joint Plan of Reorganization (the "Plan") on December 17, 1997. The Court entered an order approving the Disclosure Statement on December 29, 1997. Pursuant to the Order, the Debtors were required to notify all creditors that the deadline for filing ballots accepting or rejecting the Plan was January 9, 1998; the deadline for filing acceptances or rejections of the Plan and written objections to confirmation was February 6, 1998; and the date of the confirmation hearing was February 12, 1998. The Judgment Creditors, whose claims comprise Class 4, unanimously rejected the Plan and filed an objection to confirmation of the Plan.

1. M. Ellen Carpenter, the Chapter 11 Trustee of Zion Realty Corp., is in actuality the plan proponent on behalf of Zion. However, for convenience, the Court shall refer to the plan proponents collectively as the Debtors.

2. Section 1129 of the Bankruptcy Code provides in pertinent part the following:

   (a) The court shall confirm a plan only if all of the following requirements are met:

   (1)The plan complies with the applicable provisions of this title.... (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirement of such paragraph if the plan does not *discriminate unfairly*, and is *fair and equitable*, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

   (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

   (A) With respect to a class of secured claims, the plan provides-

   (i)(I)that the holders of such claims *retain the liens securing such claims*, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and

   (II) that each holder of a claim of such class *receive on account of such claim deferred cash payments* totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;

   (ii) for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such *liens to attach to the proceeds of such sale*, and the treatment of such liens on proceeds under clause (i) and (iii) of this subparagraph; or

   (iii) for the realization by such holders of the *indubitable equivalent* of such claims.

   11 U.S.C. § 1129(a)–(b)(emphasis supplied).

3. United Policyholders, which describes itself as "a non-profit corporation dedicated to educating policyholders about their rights and duties under their insurance policies," also filed a memorandum as *amicus curiae*.

The Judgment Creditors' claims are based on executions on judgments obtained in a civil action commenced in 1983 in the Essex Superior Court (the "Essex Superior Court action") against the Debtors in the total sum of approximately $1,800,000, which sum includes post-judgment interest to the date of the filing of the bankruptcy petitions. The issuance of the executions precipitated the filing of the Debtors' bankruptcy petitions. The judgments are partially secured by real estate attachments on property owned by Zion in Peabody and by the Salem Suede in Salem. During the Essex Superior Court action, the Debtors' insurer declined to defend the Debtors against the Judgment Creditors' claims or to indemnify the Debtors for the claims. In 1996, the Judgment Creditors brought suit against its insurer, Travelers Indemnity Company ("Travelers"), and the Debtors seeking a determination that their losses were covered by insurance policies issued by Travelers. They also sought damages under Massachusetts' consumer protection laws. This action subsequently was removed to this Court and denominated Adversary Proceeding No. 96–1298. In that adversary proceeding, all parties filed summary judgment motions, which were the subject of a Memorandum and Order issued by this Court on October 10, 1997.

In its decision of October 10, 1997, this Court considered the issue of whether Travelers is obligated to indemnify Salem Suede and Zion Realty for judgments obtained by the Judgment Creditors, as well as subsidiary issues including whether Travelers is liable to the Judgment Creditors for violations of the Commonwealth's consumer protection laws. In summary, this Court concluded that Travelers was entitled to partial summary judgment with respect to liability under the personal injury endorsement contained in its policies, but was not entitled to summary judgment with respect to liability under the pollution exclusion and violation of law exclusions contained in the policies. Most importantly for purposes of the Debtors' Plan, the Court determined that Travelers was liable to the Judgment Creditors for unfair and deceptive practices under Mass. Gen. Laws Ann. ch. 176D, §§ 1–14 (West 1987 & Supp.1997)("ch.176D") and Mass.

Gen. Laws Ann. ch. 93A, §§ 1–11 (West 1994 & Supp.1997)("ch.93A"), although the Court deferred determining the amount of damages pending a trial or resolution of the coverage issues. The Court also found that Travelers was liable to the Debtors under ch. 93A arising out of its conduct between 1994 and 1996.

The Debtors in their Disclosure Statement summarize the treatment of the Judgment Creditors' claims against both them and Travelers and the treatment of their claims against Travelers as follows:

> ...[A]ll of the Debtor's and Zion's rights and claims against Travelers (under the insurance contract, M.G.L. ch. 93A, and otherwise) will be released and Travelers [sic] obligations to all parties, under its policies of insurance, will be extinguished except as to a second, pending action, captioned *Picciotto v. Salem Suede, Inc.,* Essex Sup.Ct. No. 94–2155 (the "1994 Litigation") and a third action, *Picciotto v. BayBank,* Essex Sup.Ct. No. 97–1199, as to which Travelers has agreed to defend Salem Suede under a reservation of rights. The Secured Judgment Creditors' remaining M.G.L. ch. 93A claims, at the election of the Secured Judgment Creditors, will either be released or will be returned to state court for trial.

> Under some circumstances a Court may award damages under Chapter 93A for double or triple the amount of the actual harm incurred plus attorneys [sic] fees spent in pursuing the action. If the Debtor and Zion were to continue to pursue the action against Travelers it might generate an award which could be used to fund a dividend to creditors. It is also possible that the Debtor and Zion could be unsuccessful in pursuing these claims and recover nothing from Travelers after considerable expense. The Debtor and Zion have made the determination that the agreement of Travelers to fund payment to the Secured Judgment Creditors equal to 100% of their outstanding claims against the Debtor and Zion, and to provide reimbursement for certain fees and expenses, ... is adequate consideration for the release and will better serve the interests of

the Debtor, Zion and their creditors than continuing to litigate in an expensive process with an uncertain result. The Secured Judgment Creditors disagree with this position. Travelers, in addition to · funding the proposed dividend to Class 4 creditors, has also agreed to pay an amount up to $585,000, to fund the fees and expenses incurred by the Debtor and Zion. [sic] in these proceedings, as allowed by the Court, after the first $100,000 of such fees and expenses are paid either by the Debtor or by Zion.

Disclosure Statement, pp. 5–6. Additionally, they denominate seven classes of claims: Class 1 consists of priority tax claims under 11 U.S.C. § 507(a)(8); Class 2 consists of the unimpaired, secured claim of Eastern Bank, the Debtors' secured lender under a revolving line of credit; Class 3 consists of the claim of the Commonwealth of Massachusetts for environmental claims, which is the subject of a stipulation; Class 4 consists of and purports to treat together the secured and unsecured claims of the Judgment Creditors, referred to as the "Secured Judgment Creditors;" Class 5 consists of unsecured creditors, consisting primarily of trade debt and usual operating expenses; Class 6 consists of unsecured creditors with claims of less than $200; and Class 8 consists of the equity interests of the Debtors' stockholder. On page 8 of its 21–page Plan, at the conclusion of Article 3 in which the Debtors list the classes of claims and indicate that Classes 1, 3, 4, and 5 are impaired, the Debtors state the following:

Any holder of a claim or interest in Classes 1, 2, 3, 4, 5, 6 and/or 7 who fails to object to the classification and/or the designation as impaired or unimpaired provided in this Plan, in a writing, filed with the Bankruptcy Court and served upon counsel for the Debtor at least forty-eight hours (48) prior to the first date set for the hearing on the confirmation of this Plan, shall be deemed to have accepted such classification and/or designation and shall be bound thereby.

Plan, p. 8.

With respect to the claims of the Judgment Creditors, which total approximately $1,800,000, the Debtors in the Disclosure Statement state the following:

The judgments are secured by real estate attachments on the property owned by Zion in Peabody and by the Debtor in Salem with respect to which Zion has been making adequate protection payments since November, 1996. The Salem property is listed on the Debtor's schedules as having a value of $748,280. The Peabody property is scheduled by Zion as having a value of $658,600, the amount of the assessed value. While these values reflect current assessments, given the environmental issues involved, it is unlikely that these values, or much of any value, would be realized on liquidation.

Disclosure Statement, p. 14. At the hearing on February 12, 1998, counsel to the Debtors conceded that the Judgment Creditors' claims are allowable secured claims in the approximate amount of $300,000 due to real estate attachments. However, the Debtors, in the Liquidation Analysis attached as Exhibit F to the Disclosure Statement, discount the value of their real estate by a factor of 50% and indicate that the Judgment Creditors' secured claim may be allowable in the sum of $449,639. The balance of the Judgment Creditors' claims are unsecured.

In their Plan, the Debtors propose to treat the Judgment Creditors' claims as follows:

The Plan will result in distribution to the Secured Judgment Creditors of an equitable beneficial interest in a newly created Trust. The value of this interest will be equal to 100% of the judgment held by the Secured Judgment Creditors, with interest through date of confirmation but excluding the amount of the Adequate Protection Payments received by certain Secured Judgment Creditors since November, 1996.

The Trust will be known as the Secured Judgment Creditors Trust (the "Trust").... The Debtor, Zion and certain other persons and entities identified as insureds or as policyholders under Travelers [sic] policies of insurance will enter into an agreement with Travelers pursuant to which Travelers will agree to contribute to the Trust a cash amount equal to 100% of the judgments held by the Secured Judg-

ment Creditors *who have executed and delivered releases as provided in the agreement,* with interest through the date of confirmation and as reduced by the amount of any Adequate protection [sic] Payments to these Secured Judgment Creditors. Both Zion and the Debtor will become parties to the Trust Agreement.

The Trust proceeds will be distributed to those of the Secured Judgment Creditors. who make an affirmative election to accept the dividend under the Plan and deliver the required releases. To receive the Trust proceeds, the Secured Judgment Creditors will surrender or redeem their beneficial interests.

Disclosure Statement, pp. 15–16 (emphasis supplied). In the event a "Secured Judgment Creditor" does not elect to accept the dividend and deliver the required releases, the Debtors provide for the following treatment in the Plan:

Any Secured Judgment Creditor may in his, her or its sole and absolute discretion make an affirmative election whether or not to become a Participating Secured Judgment Creditor and thereby to accept, or not accept, the dividend payable under this Plan. Failure to deliver the Judgment Creditor Release on or within thirty (30) days from the Confirmation Date shall constitute the affirmative election of any Secured Judgment Creditor not to accept the dividend payable under this Plan. In such case the pending appeals of the Court's October 10, 1997 order by the non-electing Secured Judgment Creditor and by Travelers shall continue until finally resolved in the federal appellate system; however, all appeals of the October 10, 1997 order by Salem Suede, Zion, and the Participating Secured Judgment Creditors shall be immediately withdrawn.

Plan, p. 12. On this point, the Plan further provides:

12.1 *Remand of Adversary Proceeding.* If any of the Secured Judgment Creditors elect not to participate in the Plan, then, as provided above, the appeals of the Bankruptcy Court's October 10, 1997 Order which have been filed by that Secured Judgment Creditor and by Travelers shall

be permitted to continue in the federal appellate system until resolved, but the Confirmation Order shall provide that the claims of those Secured Judgment Creditors in [sic] shall be remanded to Essex Superior Court of the Trial Court of the Commonwealth of Massachusetts, following the resolution of all such appeals. The appeals of the October 10, 1997 order by those of the Secured Judgment Creditors who elect to participate in the Plan, and by Salem Suede and Zion shall be immediately withdrawn.

Plan, pp. 15–16.

In the Disclosure Statement, the Debtors state that the effect of a Judgment Creditor's failure to accept the dividend under the Plan and to provide the required third-party releases: the Judgment Creditors will be entitled to pursue their claims under ch. 93A, which claims are asserted against Travelers only. Under the Plan, the Debtors do not provide for payment of the Judgment Creditors' claims against them in the event the Judgment Creditors do not deliver the required releases. The effect of a Judgment Creditors' failure or refusal to participate in the Trust and to deliver the required release is 1) that the Judgment Creditors will receive no payment *whatsoever* from the Debtors with respect to either their secured or unsecured Class 4 claims; and 2) the Debtors shall be discharged of all debts, including the claims of the Judgment Creditors, and shall be revested with all of their property free and clear of all liens and encumbrances, including the valid secured claims of the Judgment Creditors.

At the hearing held on February 12, 1998, counsel to the Debtors reiterated that in order to redeem the beneficial interest in the Trust a Secured Judgment Creditor must deliver a full release of all claims against Travelers. Moreover, pursuant to the Plan and the Agreement of Settlement, Compromise and Release, attached as Exhibit G to the Disclosure Statement, executed between and among Travelers and the Debtors and affiliates and insiders of the Debtors, the following conditions are imposed with respect to the Judgment Creditors entitlement to Trust funds:

3.3 ...within seven (7) business days following Travelers [sic] receipt of the Secured Judgment Creditor Releases, and in no event later than thirty (30) business days after the Effective Date, Travelers shall pay into the Settlement Trust an amount sufficient for the Trust to pay in full the outstanding amount of the State Court Judgment held by each secured Judgment Creditor who has become a Participating Secured Judgment Creditor.... [4]

Agreement of Settlement, Compromise and Release, p. 8.

The Agreement of Release and Settlement ("Secured Judgment Creditor Release")(the "Release"), which is attached to the Disclosure Statement as Exhibit G, provides for the following signatories: 1) the "Secured Judgment Creditor"; 2) the Travelers Indemnity Co.; 3) Salem Suede, Inc.; 4) Zion Realty Corp.; 5) Zion Realty Trust; 6) Mass. Split, Inc.; 7) Casper–Salem Corp.; 8) Alan Zion; and 9) David Zion.[5] The Release defines Disputed Claims as follows:

all claims which have been, or might have been, asserted by the Settling Judgment Creditor in the State Court Action and the Adversary proceeding against Travelers or any Travelers Policyholder (including, without limitation, all claims arising under M.G.L. ch. 93A and 176D, or any implied covenant of good faith and fair dealing, or otherwise, concerning Travelers alleged actions, conduct, correspondence, dealings, or failure to respond to inquiries or claims

made by or on behalf of the Settling Judgment Creditor prior to April 30, 1996)....

Release, pp. 3–4. It recites that in consideration of the mutual covenants contained therein, the Settling Judgment Creditor "agree[s] to the settlement and release of each of his claims against Travelers *and the Travelers Policyholders [defined the Debtors, Zion Realty Trust, Mass. Split, Inc., Casper–Salem Corp., and the Zions]*, on the following terms and conditions." Release, p. 4 (emphasis supplied). The Release further provides in relevant part the following:

2. *Release By Settling Creditor.* For and in consideration of the mutual undertakings contained herein and other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Settling Judgment Creditor, for himself, his predecessors, successors, heirs, executors, agents, attorneys and assigns, hereby remises, releases and forever, discharges Travelers, and the Travelers Policyholders, and their respective agents, officers, directors, shareholders, partnerships, trustees, attorneys (including outside retained counsel), parent companies, affiliated companies, subsidiary companies, predecessors, ventures, other business entities, employees, successors and assigns from all debts, judgments, demands, actions, suits, proceedings, accounts, covenants, contracts, agreements, causes of action, damages, rights of reimbursement, insurance policies (including the Travelers Policies), and any and all other claims and liabilities of every kind, nature and description whatsoever,

4. The Agreement and Plan further provide that payments shall include post-judgment interest at a rate of 12% per annum calculated from September 29, 1993 through the earlier of (a) the date of payment of this amount by Travelers to the Trust, or (b) thirty days after the Confirmation Date of the Plan reduced by the aggregate amount of Adequate Protection Payments. The Debtors and Travelers valued the Judgment Creditors' judgments as follows:

| | |
|---|---|
| Juan Nunez | $1,311,536.40 |
| Foreign Car Center, Inc. | $ 522,803.33 |
| Stefano Picciotto | $ 67,835.73 |
| Judith Picciotto | $ 42,397.34 |

Jose Ferras previously was paid $25,000 in exchange for a release of both Travelers and Salem Suede.

5. The Court notes that Stephen J. Gordon and Gordon & Wise, Debtors' counsel herein, are to

receive all correspondence directed to the Debtors, Zion Realty Trust, Mass. Split, Inc., Casper–Salem Corp. and Alan and David Zion. The Court questions whether the dual representation of the Zions and their corporate and trust entities is a disabling conflict of interest, which may affect the allowance of compensation to Salem Suede's counsel. *See* 11 U.S.C. § 328(c).

The inclusion of Mass Split, Inc., an affiliate of the Debtors, and Casper–Salem Corp., an entity whose affiliation with the Debtors is unknown, Alan Zion, the Salem Suede's principal, and David Zion, Alan Zion's son, as signatories and parties to the Release is curious and questionable. The Debtors have neither disclosed nor indicated that the parties or entities are contributing anything to the Trust or the Plan.

known or unknown, suspected or unsuspected, arising or alleged to have arisen from the beginning of the world to the date of the Agreement, whether in law or in equity, that relate in any way (a) to the *Disputed Claims*, or (b) to other claims of property damage, personal injury, bodily injury, loss or other damage arising out of the matters and emissions which were the subject of the State Court Action or the Adversary Proceeding; or (c) other claims of unfair and deceptive trade practices, unfair and deceptive insurance practices and bad faith, whether under M.G.L. c. 93A and 176D, and implied covenant of good faith or fair dealing, or otherwise, arising as a result to Travelers alleged actions, conduct, correspondence, dealings, or failure to respond to inquires or claims made by or on behalf of the Settling Judgment Creditor at any time.

\* \* \*

6. *Contribution Among Tortfeasors Act.* All Parties to this Agreement acknowledge and agree that this Agreement is made pursuant to the Contribution among Tortfeasors Act, M.G.L. ch. 231B. It is intended not only to discharge the parties released from all of the above-described liability and claims to each other, their heirs, executors, administrators, successors and assigns, but also to discharge the Parties released from all liability for contribution to any and all other persons, firms or corporations determined by trial or other disposition of an action or claim to be tortfeasors.

Release, pp. 5–6 and pp. 7–8(emphasis supplied).

With respect to the claims of unsecured, Class 5 creditors, who will be paid from the Debtors' operating income, the Debtors' Plan provides an election. Unsecured creditors may elect to receive 100% of their Allowed Claims over ten years following the Final Confirmation Date in incremental percentages (3%, 3%, 4%, 5%, 5%, 10%, 10%, 20%, 20%, and 20%). According to the Disclosure

Statement, the present value of these payments, discounted at 10% per annum, is 51.03%, or they may elect to receive payment of a 25% dividend over a 36 month period, payable at 5% within 90 days, and 5% in each of the first and second anniversaries of the Effective Date with a final 10% on the third annual anniversary of the Effective Date.

Under the Debtors' Plan, Alan Zion shall retain his stock in the Debtors and shall otherwise receive no distribution under the terms of the Plan on account of his interest as a shareholder. The Debtors do not indicate whether Alan Zion is contributing new value in consideration for his retention of stock. Following confirmation, Salem Suede will continue to employ Alan Zion at an annual salary of $114,000 and his son David Zion, who serves as the principal operating officer, at an annual salary of $182,000.

Finally, in Article 14 of the Plan, the Debtors state that: "[p]ursuant to Section 524(e) of the Bankruptcy Code, confirmation of the Plan shall not affect (whether by way of establishing, waiving, limiting or discharging) the liability of any entity other than the debtor or Zion on any claim, except to the extent parties shall provide voluntary releases under the terms of the Plan." Plan, p. 19.

## III. POSITIONS OF THE PARTIES

### A. *Salem Suede*

Salem Suede's position [6] is predicated on the following assumption set forth on the first page of its memorandum:

[It] lacks sufficient assets to make any liquidated lump sum payment to the Judgment Creditors, whose claims total approximately $1.8 million and equal the sum of the claims held by the unsecured creditors. In sum, [Salem Suede] does not have the operating ability to generate a dividend for both unsecured creditors and the Judgment Creditors or to borrow against its assets to generate such a dividend.[7]

---

6. Only Salem Suede filed an Offer of Proof and Memorandum.

7. The Court notes that on February 25, 1998, Salem Suede filed "Debtor's Motion to Set Con-

tinued Confirmation Hearing." As grounds for its request to set a continued hearing, it stated that it believed that it could obtain a disaster loan, subject to its emergence from Chapter 11,

The Debtor argues that the legal issue before the Court is *not* the issue of the propriety of the proposed third party releases. It maintains the issue is whether the Plan provides Class 4 creditors with the indubitable equivalent of its secured claims pursuant to 11 U.S.C. § 1129(b)(2)(A)(iii). Although it cites a plethora of cases, including. *Menard-Sanford v. Mabey (In re A.H. Robins Co., Inc.),* 880 F.2d 694 (4th Cir.1989), *cert. denied,* 493 U.S. 959, 110 S.Ct. 376, 107 L.Ed.2d 362 (1989)(hereinafter *"Robins"*), in support of its position that bankruptcy courts may employ 11 U.S.C. § 105 ("the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.") to enjoin post-confirmation lawsuits by creditors against non-debtor parties, such as debtors' insurers, and that § 524(e) does not limit the power of courts to effectuate non-debtor releases under § 105, it argues that the Plan is confirmable because it provides the Judgment Creditors with the indubitable equivalent of their claims:

> In exchange for the release of the Judgment Creditors' claims against Salem Suede, the Plan provides each of the Judgment Creditors with a redeemable interest in a Secured Judgment Creditors Trust. The value of this Trust interest is "indubitably equivalent" to the amount of the Judgment Creditors' secured claim against Salem Suede. It is true that, in order to redeem their Trust interest, the Judgment Creditors must also release their claims against Travelers. The Judgment Creditors make much of this so-called "Hobson's Choice," which they describe as "unfair and inequitable." But the doctrine of "indubitable equivalency" under 11 U.S.C. § 1129 does not require that the Plan compensate the Judgment Creditors for the potential loss of third-party claims *against Travelers.* The statue requires only that "with respect to a class of secured claims [against a Debtor] the plan provide[] ... (ii) [sic] for the realization by such holders

in the amount of $1,500,00 at an interest rate of 4% per annum that would be amortized over a 15 to 30 years period. It stated that "[b]y replacing market rate financing with the disaster loan,

of the indubitable value of such claims," *i.e.,* the secured claims against the Debtor. Debtor's Offer of Proof and Memorandum of Law in Support of Plan Confirmation in Accordance with 11 U.S.C. § 1129(b)(2)(A)(iii), pp. 11–12. Salem Suede maintains that the Judgment Creditors' right to opt out of the release/ injunction provision provides them with "an alternative way to obtain the 'indubitable equivalent' of their claims against Salem Suede," if the Judgment Creditors believe that the value of their claims against Travelers exceeds the redemption value of the Trust interest. It argues that its plan is flexible, that the Judgment Creditors' logic is perverse, and that the Judgment Creditors' intransigence is an impediment to reorganization of the Debtors.

Salem Suede further argues that the Judgment Creditors are bound by their classification as secured creditors in Class 4. Additionally, it uses the following formula to measure indubitable equivalence: $1.8 million plus interest—(Independent Value of Travelers' Claims) $ or = $300,000, i.e., the value ascribed by counsel to the Judgment Creditors' attachments at the February 12, 1998 hearing. Because Salem Suede concludes that $1.8 million, less what the Judgment Creditors might obtain in an action against Travelers, exceeds $300,000, it argues that it has provided the Judgment Creditors with the indubitable equivalent of their secured claims.

### B. *The Judgment Creditors*

The Judgment Creditors argue that the Plan violates 11 U.S.C. § 524(e) because, among other things, it releases non-debtors from liabilities to the Judgment Creditors over their objection. In addition, the Judgment Creditors contend that this is not an appropriate case for the issuance of a permanent injunction which would effectively release non-debtors from liability to the Judgment Creditors. Citing *In re Master Mortgage Investment Fund, Inc.,* 168 B.R. 930, 935 (Bankr.W.D.Mo.1994), they analyze

the Debtor will save approximately $90,000 per year in interest over many years, which will assist it in meeting the terms of the Joint Plan...."

the Debtors' Plan using the following five criteria typically employed by courts taking a permissive view on the issuance of permanent injunctions and third party releases in Chapter 11 cases:

(1) There is an identity of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate.

(2) The non-debtor has contributed substantial assets to the reorganization.

(3) The injunction is essential to reorganization. Without the it [sic], there is little likelihood of success.

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has "overwhelmingly" voted to accept the proposed plan treatment.

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

(footnotes omitted).

The Judgment Creditors maintain that the Debtors have failed to meet any of the criteria. They argue that there is no identity of interest among the claims against the Debtors and Travelers and the other parties; most of the non-debtors that will be released or discharged have contributed nothing to the estate; nothing in the record supports the Debtors' assertion that reorganization is impossible unless the demands of Travelers for a complete release are met; all of the Judgment Creditors, the class most affected by the Plan provisions, object to the Plan; and the Judgment Creditors "are receiving nothing like payment of all, or substantially all, of their claims." In short, the Judgment Creditors characterize the Debtors' Plan as nothing more than "smoke and mirrors." They conclude their argument as follows:

[T]here is something unseemly and unsettling about the attempt of the Debtors, who owe fiduciary duties to their creditors, to leverage non-debtor releases or discharges for their insurer, to whom no such duties are owed, on the basis of a claimed payment of 100 cents on the dollar of some

of the claims of the Judgment Creditors while wholly ignoring the matter of compensation for the value of their claims arising and existing outside of bankruptcy.

Memorandum of Judgment Creditors in Opposition to Approval of Plan and Amended Disclosure Statement, pp. 10–11.

C. *The United States Trustee*

The United States Trustee objects to the confirmation of the Plan on the ground that it provides for improper third party releases. He notes at the outset that the United States Court of Appeals for the First Circuit has not ruled expressly on the propriety of provisions releasing or discharging non-debtors, *see Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 983–84 (1st Cir.1995)("we express no view on the soundness of the precedents cited in the confirmation order, nor on their applicability to the particular Plan proposed by Monarch Life. The proper recourse for addressing those questions was by direct appeal from the order of confirmation."). He argues that the plain language of 11 U.S.C. § 524(e) suggests that the release of third party is improper. Moreover, he argues that the salient case relied upon by the Debtors, *Robins*, is inapposite because the plan confirmed in that case was premised on a contract theory, was overwhelmingly approved by the "mass tort" claimants affected, and provided for full or close to full payment of claims. He observes that in *Robins* the tort claimants did not hold any additional claims against the insurers and were not being required to release any such claim, whereas in the instant case, the Judgment Creditors must give up a ch. 93A claim against Travelers which "are separate and apart from their judgment claims and are not even assets of the estate." Brief of the United States Trustee in Opposition to Election Provision and Release Agreement Contained in Debtors' Joint Plan of Reorganization, p. 9. Finally, the United States Trustee argues that, in view of sections 524(g) and (h), which address a very limited class of Chapter 11 cases involving asbestos liability and which were added to the Bankruptcy Code by the Bankruptcy Reform Act of 1994, "had Congress intended bankruptcy courts to have greater

leeway to effect release of non-debtor parties in cases not involving asbestos, it could have done so." Brief, p. 10.

### D. *United Policyholders, Amicus Curiae*

United Policyholders argues that the Plan cannot be confirmed because 1) the Plan violates 11 U.S.C. § 524(e) with respect to its third party release provision; and 2) the Plan provides for the unequal treatment of unsecured creditors in violation of 11 U.S.C. § 1123(a)(4). Citing *Clegg v. Butler*, 424 Mass. 413, 676 N.E.2d 1134 (1997), for the proposition that insurance companies have an independent duty of good faith and fair dealing towards third-party claimants under ch. 93A, United Policy Holders argues that the treatment of the Judgment Creditors' claims impermissibly discriminates against those holding independent bona fide ch. 93A claims. Like the United States Trustee, United Policyholders distinguishes cases such as *Robins* and *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988), in that the claims of creditors against the insurance companies in those cases were derivative of the debtors' claims against the companies. According to United Policyholders:

> ...the case at bar is the exact opposite of *Robins*. Here, the Plan proponents want to satisfy two claims, distinct as to the alleged tortfeasor, from a single fund by paying one in full but demanding a plenary release of the independent other claim against a non-debtor third-party. This is not the same as preventing a creditor from choosing between two funds from which to seek payment on a single claim, as was the case in *Robins* and *MacArthur*. Indeed, arguably the Class 4 creditors could properly be enjoined from seeking independent recovery from Travelers on their underlying damage claim against the estate, were those claims to be properly satisfied under the Plan....

Memorandum of *Amicus Curiae* United Policyholders in Opposition to Approval of Plan, p. 15.

## IV. DISCUSSION

### A. *The Plan Fails to Satisfy the Requirements of 11 U.S.C. § 1129*

▮▮▮ This Court has an independent duty to review plans and ensure that they comply with the provisions of 11 U.S.C. § 1129. If the plan is a so-called "cramdown" plan, the Court must determine whether the plan does not discriminate unfairly and is fair and equitable as to dissenting classes. The proponents of non-consensual plans bear the burden of proof by a preponderance of the evidence. 7 L. King, *Collier on Bankruptcy*, ¶ 1129.02[4], pp 1129–32–33 (15th ed. rev.1997).

A preliminary procedural issue, which the parties do not address in their memoranda, is whether the Judgment Creditors are bound by the Debtors' separate classification of their claims and whether that separate classification can serve to obfuscate the nature of the Judgment Creditors' claims. The Court finds that the notice buried in the Plan and omitted from the Order approving the Disclosure Statement does not require this Court to ignore the Debtors' designation of the Judgment Creditors' claims as "secured." Accordingly, the Court must consider the nature of the Judgment Creditors' claims.

The Judgment Creditors have claims against the Debtors secured by valid attachments; they also have unsecured claims against the Debtors in the amount of the difference between the value of the real estate subject to their attachments and their state court judgments plus interest. The Judgment Creditors also have claims against Travelers that are derivative of the Debtors' claims against Travelers. Moreover, they have independent claims against Travelers pursuant to ch. 176D and ch. 93A that are separate and distinct from their claims against the Debtors and do not derive from or relate in any way to the conduct of the Debtors that precipitated their injuries in the first instance. *See Clegg v. Butler*, 424 Mass. at 418, 676 N.E.2d 1134 ("The duty of fair dealing in insurance settlement negotiations is established by statute under G.L. c. 176D, § 3(9), and the specific duty contained in subsection (f) is not limited to those situa-

tions where the plaintiff enjoys contractual privity with the insurer.").[8]

■ The Court finds that the Debtors' treatment of the Judgment Creditors' claims by placing the secured and unsecured claims in the same class and by separately classifying the Judgment Creditors' unsecured claims from those of other unsecured creditors is improper under 11 U.S.C. § 1122(a) and *Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984). In *Granada Wines*, the United States Court of Appeals for the First Circuit ruled that a debtor could not separately classify a pension fund's unsecured withdrawal liability from the claims of other unsecured creditors. It stated the following:

> [t]he general rule regarding classification is that " 'all creditors of equal rank with claims against the same property shall be placed in the same class.' " Separate classifications for unsecured creditors are only justified " 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors....' "

748 F.2d at 46 (citations omitted).

In the present case, the Debtors place the secured and unsecured claims of the Judgment Creditors in the same class and, thus, separately classify the Judgment Creditors' unsecured claims from the claims of other general unsecured creditors. Accordingly, the Debtors' placement of the Judgment Creditors' secured and unsecured claims together in the same class runs afoul of the rule set forth in *Granada Wines*. Although the Judgment Creditors' claims against the Debtors arose in a different fashion from other unsecured and trade debt, their unsecured claims are of a legal character indistinguishable from that debt, and, therefore, the Debtors must treat the claims in a manner that is consistent with the Bankruptcy Code. The Debtors' separate classification of the Judgment Creditor's unsecured claims violates 11 U.S.C. § 1129(a)(1).

■ With respect to the Debtors' proposed treatment of the Class 4 claims, the Court also finds that the Debtors have failed to satisfy the requirements of § 1129(b)(1). In particular, the Court finds that the requirements that the plan not discriminate unfairly and that the plan be fair and equitable with respect to an impaired rejecting class have not been met.

■ Whether a plan unfairly discriminates is tested by an objective standard: "[in] a nutshell, if the plan protects the legal rights of a dissenting class in a manner consistent with the treatment of other classes whose legal rights are intertwined with those of the dissenting class, then the plan does not discriminate unfairly ..." Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down under the New Bankruptcy Code*, 53 Am. Bankr.L.J. 133, 142 (1979). A plan can discriminate, but not unfairly; any discrimination must be supported by a legally acceptable rationale, and the extent of the discrimination must be necessary in light of the

---

8. None of the parties have addressed the issue of the Court's jurisdiction to enjoin the Judgment Creditors from pursuing independent claims against Travelers. As the court observed in *In re Sybaris Clubs International, Inc.*, 189 B.R. 152 (Bankr.N.D.Ill.1995),

> ... there could be appropriate cases for issuance of such an injunction under the "related to" jurisdiction of the Bankruptcy Court. Such jurisdiction is found to exist where the subject of the third party dispute is property of the estate, or because the dispute over the asset would have an effect on the estate. Absent those findings no basis exists for assumption of jurisdiction.... "It is the relation of dispute to estate, and not of party to estate that establishes jurisdiction...."

189 B.R. at 155 (quoting *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 755 (5th Cir.1995)).

In the instant case, the Judgment Creditors have claims against Travelers that are independent of their claims against the Debtors, *see Clegg v. Butler*, 424 Mass. at 418, 676 N.E.2d 1134, and claims against Travelers that arise from their status as third-party beneficiaries of the Debtors' insurance policies. The former claims, the nature of which are detailed in the opinion of October 10, 1997, have no effect on the Debtors' Plan, as they are not property of the bankruptcy estate. However, to pursue those claims, as well as their derivative claims against Travelers, the Judgment Creditors must forfeit their attachments, as well as their deficiency claims against the Debtors. Accordingly, the Court's jurisdiction to enjoin the Judgment Creditors from taking action with respect to their independent claims against Travelers is problematic at best.

rationale. *In re 203 North LaSalle Street Limited Partnership,* 190 B.R. 567, 585–86 (Bankr.N.D.Ill.1995). It is unfair discrimination for a plan proponent to pay claims of equal, nonbankruptcy priority a different distribution by providing one class of creditors with a more favorable distribution than a class of the same legal rank without a legitimate and rational basis for the disparate treatment. *See In re Barney & Carey Co.,* 170 B.R. 17, 26 (Bankr.D.Mass.1994) (unfair discrimination to pay unsecured claims guarantied by insiders 100% while paying unsecured trade claims 15% dividend); *In re Cranberry Hill Assocs. Limited Partnership,* 150 B.R. 289, 291 (Bankr.D.Mass.1993)(unfair discrimination to pay trade creditors in full and in cash on confirmation while paying deficiency claimant in full over 9 years without interest): *In re ARN LTD. Limited Partnership,* 140 B.R. 5, 13 (Bankr.D.C.1992)(unfair discrimination to pay some unsecured creditors a dividend while paying tenants zero).

The Debtors' Plan discriminates unfairly against the Judgment Creditors because no other creditors, secured or unsecured, are forced to forfeit their liens or distributions from the Debtors if they do not provide a release of third parties, such as Travelers and several insiders of the Debtors. The Debtors have provided the Judgment Creditors with a right to redeem shares in a Trust in order to be paid in full on their secured and unsecured claims, conditioned upon the complete release of Travelers and others. If the Judgment Creditors do not redeem their interest in the Trust, they must continue to litigate their claims against Travelers to recover the amount of their valid liens against the Debtors, as well as the amount of their claims against the Debtors and Travelers. Moreover, and most importantly, if the Judgment Creditors do not elect to redeem the shares in the Trust and choose instead to pursue their claims against Travelers, the Debtors through their Plan make no provision for the Judgment Creditors' secured and unsecured claims. In other words, the Judgment Creditors can only satisfy their claims against the Debtors by releasing their claims against Travelers, and they can only satisfy their claims against Travelers by having

their claims against the Debtors discharged. The bottom line of the Debtors' Plan is that unless the Judgment Creditors elect to redeem their beneficial interest in the Trust within 30 days of confirmation and deliver releases of both their derivative *and* direct claims against Travelers, they receive nothing on account of their allowable and valid secured and unsecured claims against the Debtors. In short, the Plan is structured in such a way that the Judgment Creditors must *buy* the right to receive the amount of their partially secured judgments against the Debtors with their unliquidated and non-derivative claims against Travelers and other non-debtors, who, unlike Travelers, have contributed nothing toward the satisfaction of the Judgment Creditors' claims. The Debtors asserted reason for the disparate treatment—that it lacks the ability to pay a dividend to both the Judgment Creditors and unsecured creditors, who are receiving 51% dividend under the Plan—is unsubstantiated by any competent evidence. The Debtors have failed to show that the discrimination against the Judgment Creditors has a rational and legitimate basis.

The treatment of the Judgment Creditors' liens also discriminates unfairly against them. Because the Judgment Creditors are forced to relinquish their liens if they do not choose to redeem their interest in the Trust, it discriminates unfairly between them and Eastern Bank, which is unimpaired and not required to release its liens to have its claim satisfied.

■■■■ In addition to the prohibition against unfair discrimination, the plan proponent must show that the treatment of a dissenting class is "fair and equitable." "A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is fair and equitable." *Federal Sav. & Loan Ins. Corp. v. D & F Constr., Inc. (In re D & F Constr., Inc.),* 865 F.2d 673, 675 (5th Cir. 1989). In the present case, the Plan does not provide for the fair and equitable treatment of the Judgment Creditors' secured claims in accordance with 11 U.S.C. § 1129(b)(2)(A). Under the Plan, unless the Judgment Credi-

tors provide the required release, they do not retain their lien securing their claims to the extent of the allowed amount of such claims, do not receive deferred cash payments of at least the value of their interest in the estate's interest in the collateral that secures their claim, and do not receive the proceeds of any sale of their collateral. *See* 11 U.S.C. § 1129(b)(2)(A)(i), (ii), (iii). The Debtors' contention that their treatment of the Judgment Creditors' secured claims complies with 11 U.S.C. § 1129(b)(2)(A)(iii) as it enables them to realize the "indubitable equivalent" of their secured is without merit.

██ In *Freymiller Trucking, Inc.,* 190 B.R. 913 (Bankr.W.D.Okla.1996), the court, citing Webster's Third New International Dictionary, Unabridged (1981), defined indubitable equivalence as follows:

The analysis begins with an examination of the ordinary meaning of the language chosen by Congress. Something is dubitable if its open to doubt or question and, conversely, is indubitable if it is not open to any doubt. One might say, therefore, that the evidence of the requisite indubitable equivalent is present if, under the treatment proposed in the plan, there is no reasonable doubt but that the bank will receive the full value of what it bargained for.... In other words, is there any real doubt but that, as a matter of fact, the bank will be paid in full? It goes without say that, since we are operating in a court of law, the interrogatory can be answered only by an examination of the evidence in the record. What, then, does the evidence show that the bank will be owed in six months and what does it show the property will be worth?

190 B.R. at 915–16 (citations omitted). *See also Collier, supra* at ¶ 1129.05[2][c] p. 1129–136. Applying this test, the Court is unable to conclude that the Debtors have sustained

their burden of proving that the Plan provides the Class 4 creditors with the indubitable equivalent of their secured claims under 11 U.S.C. § 1129(b)(2)(A)(iii).

The Debtors postulate that the value of the Judgment Creditors' beneficial interests in the Trust will equal or exceed the value of their claims against Travelers plus whatever the Judgment Creditors would receive in a liquidation on their secured claims against the Debtors, namely $300,000. However, neither the Debtors nor Travelers have submitted *any* competent evidence of the value of the Judgment Creditors' dual claims against Travelers. These claims remain unliquidated, subject to determination in the adversary proceeding, in which interlocutory appeals are pending in the United States District Court for the District of Massachusetts. They may be *de minimis*. Alternatively, their value may be substantial.

In the present case, the Court is dealing with two unknowns that make Salem Suede's mathematical equation unsolvable. In the first place, the value of the Debtors' real property that is subject to attachment has not been determined with any certainty. At various times, the Debtors have maintained that because of environmental contamination the properties are worth nothing. At the hearing on February 12, 1998, the Debtors argued that the Judgment Creditors' secured claims are worth $300,000. The Liquidation Value attached to the Disclosure Statement contains yet another figure.

Similarly, the Debtors argue that the Judgment Creditors' independent claims against Travelers and other non-debtors who would benefit from the release are not worth much.[9] However, the Court has received no evidence as to the value of these claims, which may be doubled or tripled. Thus, assuming for the sake of argument that the Judgment Creditors might obtain a $700,000

9. The Court observes that the Debtors waived their claims against Travelers in consideration of a cash infusion of $585,000 toward the payment of administrative claims. This waiver permits the inference that the Debtors believe their claims are worth $585,000 and that the Judgment Creditors' claims against Travelers may be worth at least an equal amount. In the Memorandum dated October 10, 1997 issued in the adversary proceeding, this Court found that Travelers had committed unfair and deceptive insurance practices against *both* the Debtor and the Judgment Creditors. Travelers' liability to *the Judgment Creditors, however,* may be greater than its liability to the Debtors in view of the Court's findings of fact that Traveler's conduct *towards the Judgment Creditors was* unconscionable.

judgment against Travelers that was tripled, under the Debtors' Plan the Judgment Creditors would have to relinquish $2.1 million and their attachments to obtain $1.8 million plus interest. Although this scenario may or may not be probable, it highlights the impossibility of finding indubitable equivalence.

Because the amount of any recovery by the Judgment Creditors against Travelers is uncertain, the value of the election forced upon them is impossible to quantify for purposes of applying the tests set forth in 11 U.S.C. § 1129(b)(2). The Court finds that a set of circumstances could exist under which the Judgment Creditors might recover more than $1.5 million from Travelers at the conclusion of the litigation in the adversary proceeding. The Judgment Creditors are receiving nothing on account of their independent claims against Travelers under the Plan, because Travelers is funding only the Debtors' liability to the Judgment Creditors through the Trust vehicle. To obtain payment of their claims against the Debtors, the Judgment Creditors must release independent claims against Travelers, the value of which is undetermined. Although the wisdom of the Judgment Creditors' decision to reject full payment of their secured and unsecured claims against the Debtors may be open to question, the provisions of the Plan requiring them to "buy" the satisfaction of those claims via the release of other claims against Travelers and other non-debtors must be evaluated apart from that consideration. The Debtors' distinction between the right to receive and actual receipt of indubitable equivalence in the absence of competent evidence as to the value of the real estate and the value of the Judgment Creditors' claims is unpersuasive.

### B. Under the Circumstances of this Case, the Discharge of Non–Debtor is Unwarranted

■ In re A.H. Robins Co., Inc., 880 F.2d 694 (4th Cir.1989), the Court of Appeals upheld the confirmation of a Debtor's Plan that enjoined litigation brought by tort claimants against third party defendants. In the present case, the Debtors' reliance on the two Robins decisions is unpersuasive for a num-

ber of reasons. In the first place, the number of claimants in Robins was 195,000 and their claims, for the most part, were unliquidated and unsecured by liens or attachments. Moreover, in Robins, as in A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 1013 (4th Cir.), cert. denied, 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986), "if each [unliquidated] claim was tried the process itself 'would likely consume all the assets of the debtor.'" Robins, 880 F.2d at 698. In contrast, in the instant case, there are four Judgment Creditors with partially secured, liquidated claims against the Debtors. Moreover, the Debtors' attorneys have been compensated for the costs of defending the state court actions, and Travelers has agreed to provide the Debtors with $585,000 toward the payment of administrative claims, whether or not the Judgment Creditors elect to redeem their shares in the Trust.

Secondly, in Robins, 94.38% of the 135,605 claims voting voted in favor of the plan. In the instant case, the Judgment Creditors either did not vote or voted against the Plan and filed an objection to confirmation of the Plan. Finally, the challenged channeling injunction in Robins inured to the benefit of "Robins' directors, Robins' and Aetna's attorneys, and Aetna, seeking to hold them as joint tortfeasors with Robins for Dalkon shield injuries." Id. at 699 (emphasis supplied). In the instant case, the channeling injunction would inure to Travelers' benefit, not as a joint tortfeasor with the Debtors, but rather with respect to its own conduct in handling the Judgment Creditors' inquiries as to coverage issues.

In Robins, the court described the injunction as follows:

The Plan's injunction ... only has real impact upon members of Class B who have elected to opt-out of the Breland settlement. The injunction under ... the Plan prevents these claimants from suing all third parties other than "insurer[s]" (which includes Aetna) and claims based exclusively on medical malpractice. The class B members who have elected to opt-out, it is remembered, claim to have causes of action as joint tortfeasors with Robins against Robins' directors, Aetna, and law firms who represented both Robins and

Aetna. A suit against any of the parties mentioned by the class B opt-out members would effect the bankruptcy reorganization in one way or another such as by way of indemnity or contribution. And in all events, provision for payment in full of all class B claimants has been made. ·

*Id.* at 701. The court permitted the issuance of an injunction using the "ancient but very much alive doctrine of marshalling of assets." *Id.* The court added: "[a] creditor has no right to choose which of two funds will pay his claim. The bankruptcy court has the power to order a creditor who has two funds to satisfy his debts to resort to the fund that will not defeat other creditors ." *Id.* (citations omitted).

In the instant case, if the Judgment Creditors were to pursue Travelers with respect to their independent claims, it would have no effect on the Debtor' Plan, other than to eliminate a source of funding. Moreover, it is the Debtors who are choosing which of two funds will pay the Judgment Creditors' claims. The Judgment Creditors have multiple claims and can look to several sources of funds: the Debtors' real property with respect to their secured claims, the Debtors' operating income with respect to the deficiency claims, and Travelers. Accordingly, the analogy to the doctrine of marshalling employed by the court in *Robins* is not pertinent to the instant case.

The Court of Appeals for the Fourth Circuit concluded that § 524(e) should not be applied to defeat the *Robins* plan because the Plan was "overwhelmingly approved" and because it gave late claimants the following:

a second chance ... to recover, where, nevertheless, some have chosen not to take part in the settlement in order to retain rights to sue certain other parties, and where the entire reorganization hinges on the debtor being free from indirect claims such as suits against parties who would have indemnity or contribution claims against the debtor.

*Id.* at 702. In the instant case, if the Judgment Creditors' claims against the Debtors were considered outside the context of the present Plan and without a contribution from Travelers and the required releases, the Judgment Creditors could pursue Travelers for the independent claims that they have

against it, and Travelers would have no right of indemnity or contribution from the Debtors for its liability under ch. 176D and ch. 93A for its conduct in handling the Judgment Creditors requests for information.

This Court need not decide if a so-called channeling injunction is *per se* prohibited by § 524(e). The Court agrees with the Judgment Creditors that the factors articulated by the Court in *Master Mortgage,* 168 B.R. at 935, are not present in the instant case.

Moreover, § 524(g), which codifies a recent amendment to the Bankruptcy Code, suggests that § 524(e) precludes the issuance of such an injunction. Section 524(g) provides that in asbestos cases, if a series of conditions are met, an injunction issued in connection with a reorganization plan may preclude litigation against third parties. According to the court in *Resorts International, Inc. v. Lowenschuss (In re Lowenschuss),* 67 F.3d 1394 (9th Cir.1995), *cert. denied,* 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996),

The numerous requirements of § 524(g) make it clear that this subsection constitutes a narrow rule specifically designed to apply in asbestos cases only, where there is a trust mechanism and the debtor can prove, among other things, that it is likely to be subject to future asbestos claims .... That Congress provided explicit authority to bankruptcy courts to issue injunctions in favor of the third parties in an extremely limited class of cases reinforces the conclusion that § 524(e) denies such authority in other, non-asbestos cases.

*Id.* at 1402 n. 6. Accordingly, the Court finds that under the circumstances of this case, the provisions of the Debtors' Plan requiring the Judgment Creditors to elect to redeem an interest in a Trust in exchange for releases that are tantamount to an injunction against numerous non-debtor affiliates and Travelers is not warranted. The circumstances present in *Robins* and similar cases are not present here.

## V. CONCLUSION

Upon consideration of the foregoing, the Court hereby denies confirmation of the Debtors' Plan. In view of 1) the delay in obtaining confirmation of the Debtor's Plan, which was filed nearly one year ago on April 15, 1997; and 2) the pending requests of the

Judgment Creditors and a Class 5, unsecured creditor, United States Leather, Inc. ("U.S.Leather"), for the appointment of an examiner, or in the alternative, for a Chapter 11 Trustee,[10] the Court finds that the appointment of a Chapter 11 Trustee is in the best interests of creditors and the estate. *See* 11 U.S.C. § 1104(a). Accordingly, the Court *sua sponte* appoints a Chapter 11 Trustee in Salem Suede.

**10.** The Judgment Creditors filed a motion for the appointment of a Chapter 11 Trustee on October 28, 1996, which motion the Court denied on November 13, 1996. In lieu of appointing a Trustee, the Court directed counsel to the creditors' committee to investigation the allegations of voidable transactions as asserted by the Judgment Creditors. The committees' counsel filed a report on January 10, 1997. On January 10, 1997, Melita Picciotto filed a Motion for the Appointment of a Chapter 11 Trustee, which she withdrew on January 29, 1997. On July 3, 1997 the Judgment Creditors filed a Motion for Expedited Appointment of Examiner to Investigate Preferences, Fraudulent Transactions, and Nonscheduled Property (the "Examiner Motion"). On July 16, 1997, U.S. Leather filed a statement in support of the Examiner Motion. The Court held two hearings on the Examiner Motion and, on December 10, 1997, continued the Examiner Motion generally. On February 11, 1998, U.S.

Leather filed an Objection to Calculation of Voting of Class of Unsecured Creditors Under Second Amended Joint Plan of Reorganization proposed by Salem Suede, Inc. and Zion Realty Corp., raising an issue as to whether Class 5 was an assenting impaired class and whether the Plan satisfied the absolute priority rule. *See* 11 U.S.C. § 1129(b)(2)(B)(ii). On February 12, 1998, at the confirmation hearing, the Court differed ruling on the issues raised by U.S. Leather's objection.

Subsequently, on March 16, 1998, U.S. Leather filed a Motion for Hearing on the Examiner Motion, through which it now seeks the appointment of an examiner or a trustee under 11 U.S.C. § 1104 to investigate and commence avoidance actions. As ground for the Motion, U.S. Leather stated that the statute of limitations under 11 U.S.C. § 546 expires on April 30, 1998—less than six weeks from the date of this decision.