**In re MAHONEY HAWKES, LLP, Debtor.**

**No. 01–12880–WCH.**

United States Bankruptcy Court, D. Massachusetts, Eastern Division.

Nov. 13, 2002.

William W. Kannel, Daniel S. Bleck, Mintz Levin, Cohn, Ferris, Glovsky & Popeo, Boston, MA, for Go–Best.

David S. Madoff, Cohn Khoury, Madoff & Whitesell, LLP, Boston, MA, for the Creditors' Committee.

Christopher J. Panos, Taylor A. Greene, Craig & Macauley & Braunstein, Boston, MA, for Debtor.

## DECISION REGARDING MOTION FOR APPROVAL OF DISCLOSURE STATEMENT AND ENTRY OF PROCEDURAL ORDER

WILLIAM C. HILLMAN, Chief Judge.

### I. *Introduction*

On April 6, 2001 Mahoney Hawkes, LLP (the "Debtor") filed for relief under chapter 11. The Debtor was a law firm which had, in addition to other unsecured debt, outstanding malpractice claims. It carried a "Claims Made and Reported" legal malpractice insurance policy (the "Policy") with Continental Casualty Company ("CNA"). In its disclosure statement and plan, the Debtor seeks to separately classify the malpractice claimants from the other unsecured creditors; obtain a permanent injunction and releases for the insurer and the partners of the Debtor; and obtain a discharge for the Debtor. At the hearing on the disclosure statement, a creditor and the Court raised concerns about these issues. After hearing the arguments, the matter was taken under advisement. The following constitute my findings of facts and conclusions of law.

### II. *Background*

On April 18, 2002, the Debtor and the Official Committee of Unsecured Creditors (the "Committee") filed a motion to approve a [Proposed] Disclosure Statement for Joint Plan of Reorganization Proposed by Mahoney Hawkes, LLP and the Official Committee of Unsecured Creditors (the "Disclosure Statement"). In it, the Debtor gives the following background regarding the bankruptcy filing:

> The circumstances that gave rise to the Debtor's chapter 11 proceedings involved well-publicized claims arising from alleged actions of Morris M. Goldings, a former partner of the Debtor. Goldings is alleged to have improperly handled a substantial amount of clients' funds for which he has not accounted. Goldings has since pleaded guilty to a number of federal charges. As the facts and magnitude of the reported breaches of trust by Goldings emerged, the Debtor took a number of immediate steps to avoid further injury to its clients and to maximize the chance of recovering funds on their behalf. . . .
>
> A number of claimants provided notice of claims or commenced lawsuits against the Debtor, Goldings and the Partners. On or about March 29, 2001, several creditors filed an involuntary bankrupt-

cy against Goldings. Substantial efforts were made by the Debtor and other interested parties to negotiate terms of a plan to address all valid claims against the Debtor. Prior to the Petition Date, nine civil actions that named the Debtor as a defendant were known to be pending in the Superior Court Department of the Trial Court of the Commonwealth of Massachusetts. After consultation with essentially all known parties asserting claims against Goldings and the Debtor, the Debtor determined that this chapter 11 proceeding would likely provide the best forum to maximize the recovery for claimants possessing valid claims and ensure a process for the efficient and fair resolution of claims.

Disclosure Statement, p. 6–7.

With respect to its post-petition operations, the Debtor explains:

The Debtor is currently operating with a substantially reduced staff from offices located at 20 Park Plaza, Boston, Massachusetts. The Debtor is not currently providing legal services to clients. As of September 30, 2001, the active Partners ceased providing legal services in affiliation with the Debtor. A number of associate attorneys and other contract attorneys left the firm prior to that date. The Partners who have continued to practice law have become affiliated with other law firms or are practicing law as sole practitioners. Other than two of the Partners, none of the Partners are presently affiliated with the same law firm.

*Id.* at 8.

The Disclosure Statement provides this summary of to the Joint Plan of Reorganization Proposed by Mahoney Hawkes LLP and the *Official Committee of Unsecured Creditors* (the "Plan")[1]:

The Plan provides for the creation of a Creditors' Trust on the Effective Date, to be funded by a payment of $6.5 million by CNA and to be funded by Firm Payments and Partner Contributions that the Debtor estimates will aggregate to between $600,000 and $1.2 million as specified in the Plan and more fully described below in Section VI(F) of this Disclosure Statement.

Holders of Allowed Insured Claims shall receive a Pro Rata beneficial interest in the Creditors' Trust and shall receive a Distribution on such Claims from the CNA Payment less certain expenses incurred by the Creditors' Trust as provided in the Plan. These expenses will include the costs of investigating and prosecution of claims objections, the cost of administering the Creditors' Trust, such as accounting fees, and the costs of finally administering the Estate. Holders of Allowed Other Claims (which is defined in the Plan to include any amount of Allowed Insured Claims not satisfied by payment from the net CNA Payment) shall receive Pro Rata beneficial interest in the Creditors' Trust and shall receive Distributions on such Claims from net Proceeds recovered by the Creditors' Trust, other than the CNA Payment. Holders of allowed Administrative Claim and Allowed Secured Claims shall be paid the full amount of such Claims on or as soon as practicable after the Effective Date, or the date on which an order of the Bankruptcy Court allowing such Claim becomes a Final Order, whichever is later.

*Id.* at 9.

Subsection VI of the Disclosure Statement, entitled "the Plan", describes the classification of the various claims. Specifically, that subsection provides:

3. *Class 3.* Class 3 shall consist of Allowed Insured Claims, which are any

---

1. The Plan and Disclosure Statement contain the definitions for the capitalized terms.

non-priority, unsecured Claims determined by Final Order to be a legally enforceable obligation or liability of the Debtor or the Partners of the type for which coverage would have been provided under the Policy. No Claim shall be an Allowed Insured Claim unless, prior to the Voting Deadline, the holder of such Claim shall have affirmatively asserted such a Class 3 Insured Claim under the Plan on the ballot submitted with respect to voting on the Plan. A determination that a Claim is of the type for which coverage would have been provided under the Policy' shall be a determination for the purpose of effectuating the Plan only and shall not constitute an adjudication for any other purpose or an admission by any entity. As set forth on Table B of this Disclosure Statement, the Debtor believes that the amount of Allowed Insured Claims that will be asserted could range to $26,248,997.

4. *Class 4.* Class 4 shall consist of Allowed Other Claims, which shall be (I) any Claim that is determined by Final Order to be a liability of the Firm or any partner (which Liability of a Partner would otherwise constitute a Released Claim) that is not an Allowed Insured Claim and (ii) any amount of an Allowed Insured Claim that is not paid from Distributions made or to be made under the Plan on account of Allowed Insured Claims. As set forth on Table B of this Disclosure Statement, the Debtor believes that the amount of Allowed Other Claims could range from $7,078,047 to $21,077,044, of which $191,932 is the amount of commercial-type claims not anticipated to be reduced to Allowed Convenience Claims and of which $886,115 is an amount estimated for the Debtor's landlord's lease rejection claim. *Id.* at 14.

The Disclosure Statement describes the Plan provisions for the payment of claims:

1. Class 3: Allowed Insured Claims

*The treatment and consideration to be received by the holders of Allowed Class 3 Claims shall be in full satisfaction of any and all of their respective Claims against the Debtor, the Estate and each of the Contributing Parties.* Each holder of an Allowed Class 3 Claim shall receive a Pro Rata beneficial interest in the Creditors' Trust and shall receive Distributions in accordance with the terms of the Plan from Proceeds of the CNA Payment remaining after payment of all amounts required to be paid by the Creditor Trustee from the Creditor's Trust under the Plan (other than Distributions on account of Allowed Other Claims). As provided in Article 2.4 of the Plan, any unpaid portion of an Allowed Insured Claim shall constitute an Allowed Other Claim.

2. Class 4: Allowed Other Claims

*The treatment and consideration to be received by the holders of the Allowed Class 4 Claims shall be in full satisfaction of any and all of their respective claims against the Debtor, the Estate and each of the Contributing Parties.* Each holder of an Allowed Class 4 Claim shall receive a Pro Rata beneficial interest in the Creditors' Trust and shall receive Distributions from the Creditors' Trust from Proceeds (other than the CNA Payment) remaining after payment of all amounts required to be paid by the Creditor Trustee from the Creditors' Trust in accordance with the terms of the Plan.

*Id.* at 16 (emphasis in original).

The Disclosure Statement describes the means by which the Creditors' Trust will be funded. The first source is the payment by CNA:

a. *CNA Payment.* On the Effective Date, CNA shall pay $6,500,000 to the Creditor Trustee (the "CNA Payment") to be administered in accordance with the terms of the Plan, in full satisfaction of CNA's obligations to any and all entities, including without limitation the Debtor and all holders of Claims, under, arising from or in any way relating to the Policy. On the Effective Date, subject only to delivery of such CNA Payment, all entities, including without limitation, the Debtor, its estate, holders of Claims, and the Partners, shall be deemed to have released, remissed, and discharged CNA of any claims or Causes of Action held by any of them against CNA, its officers, director, employees, attorneys, corporate parents or affiliates, arising under the Policy, from the administration thereof, or handling of claims make thereunder, and the release and injunction provided in Article 6.5 of the Plan shall be effective as to CNA

. . .

Prior to the Petition Date, CNA negotiated extensively with the Debtor and a number of claimants. During the Chapter 11 Case, after extensive negotiations with the Debtor, Committee and the Partners, CNA agreed to compromise its position regarding the Policy by funding the Plan on the terms set forth therein upon the consent of the Partners. By agreeing to pay $6.5 million to satisfy its obligations under the Policy, CNA will be paying approximately $2.2 million more than it asserted was the available coverage under the Policy. The estate will not be required to litigate the related to provision of the Policy or the issue of whether coverage exists under the terms of the Policy for the Debtor. Each of the Partners has

agreed as part of the Plan to assign each of their rights to indemnification and defense under the Policy to eliminate further obligations of CNA under the Policy (except for an extended reporting period applicable to one of the Partners) and to permit CNA to satisfy its obligations under the Policy by making the CNA payment as provided in the Plan. *The Plan provides that CNA and each of the Partners shall be released from all Released Claims upon performance of their respective obligations under the Plan.*

*Id.* at 21–22 (emphasis in original).

The second source of funding is the proceeds from the liquidation of any of the Debtor's assets. *Id.* at 23. The third source is from the Debtor's former partners: [2]

c. *Partner Commitments.* On the Effective Date, each Partner shall be deemed, without further act, notice, or order, to have assigned his or her rights to defense and indemnification under the Policy and any claims against CNA relating to the Policy to the Debtor to be released by the Debtor pursuant to the Plan; provided, however, that William Hawkes shall retain all rights as may exist in the extended reporting period under the Policy as set forth in Article 6.3.1 of the Plan. *Each Partner shall be deemed to have released, remissed, and discharged each other partner from any and all Released Claims....* Subject to the terms of the Escrow Agreement, the escrow agent thereunder shall pay to the Creditor Trustee on the first Business Day to occur thirteen (13) months after the Effective Date the lesser of (I) the amount of funds held in escrow pursuant to the Escrow Agreement (the Escrowed Amount') or (ii) an amount

**2.** The former partners have not filed any pleadings with respect to the matters discussed in this Decision.

equal to the result of $1.2 million, less the amount of any Proceeds (other than the CNA Payment) received but the Creditor Trustee as of the first Business Day to occur twelve (12) months after the Effective Date . . . .

Disclosure Statement, p. 24 (emphasis in original).

The next applicable section of the Disclosure Statement is entitled "Release and Injunction Prohibiting Actions Against Contributing Parties". It provides in part:

*Upon the occurrence of the Effective Date, no entity (including, without limitation, any holder of a Claim, the Debtor, the Partners, CNA, the Steering Committee, and the Creditor Trustee) shall have or shall commence, prosecute or otherwise assert at any time any Cause of Action, claim, demand or action against any Contributing Party, or any successor or assign, based on or arising from any Released Claim. Upon the Effective Date, each Contributing Party shall be deemed released, discharged and remissed from any and all Released Claims. Occurrence of the Effective Date is an express condition precedent to the effectiveness of the release and injunction provisions of Article 6.5 of the Plan. The Confirmation Order shall contain a permanent injunction consistent with the terms of Article 6.5 of the Plan which shall have the effect of a release in favor of the Contributing Parties from any and all Released Claims and which shall enjoin all entities from commencing, prosecuting or asserting at any time Released Claims. As such, the Plan provides for relief enjoining entities from pursing claims against non-debtor parties that are Contributing Parties. The Confirmation Order shall be effective against any entity that receives actual knowledge thereof whether or not such entity filed a proof of claim or had prior knowledge of any bar date, the Plan, entry of the Confirmation Order or any matter in connection with the Chapter 11 . . . .*

*Id.* at 26 (emphasis in original).[3]

The final provision that pertains to this decision is found in Subsection VI, F, 7. That section provides that the on the Effective Date of the Plan, the Debtor will receive a discharge pursuant to § 1141(d)(1)(A) of the Code. *Id.* at 28.

### III. *The Objection and Response Thereto; Proceedings to Date*

Go–Best Assets Limited ("Go–Best") filed an objection (the "Objection") to the

---

**3.** The Plan defines Released Claim as

[A]ny claim, demand, or right of action held by any entity against any Contributing Party arising from or relating to (I) the Policy or administration thereof, including without limitation any claim under Mass. Gen. L. Chs. 93A or 176D, (ii) the same facts or circumstances giving rise to or relating in any way to any Claim asserted against the Debtor in the Chapter 11 Case, (iii) any act or omission of Goldings or in connection with any matter in which Goldings had substantially responsibility, or (iv) any act or omission by any Partner relating to Goldings or his activities. "Released Claims" shall also mean any and all Causes of Action, claims, demands, or actions held at any time by the Debtor or its estate against any Contributing Party and any other claim held by the Debtor or its estate against any Contributing Party and any other claim held by the Debtor or its estate that could give rise to any liability and a right to affirmative recovery from a Contributing Party. "Released Claim" shall exclude any claims against Goldings and any claim against any Contributing Party that may arise from a breach of such party's obligations under Article 6.3.3 of this Plan. Plan, p. 8–9.

The Plan defines Contributing Parties as the Debtor, the partners of the Debtor, excluding Goldings and CNA. In addition to these parties, it also includes their "present and former employees, officers, directors, members, partners, agents, and attorneys." Plan, p. 5.

Disclosure Statement on the grounds that it does not contain sufficient information in violation of 11 U.S.C. § 1125(a) and that the Plan is unconfirmable.[4] With respect to the lack of information, Go–Best points to the differing treatments of Classes 3 and 4 under the Plan. It claims that the Debtor did not provide enough information to explain the differences and that such information is necessary given the great disparity of the return on the claims. Moreover, it asserts that the Plan artificially encourages creditors to vote as Class 3 creditors even though such an election is not binding on the Debtor.[5]

Go–Best further argues that the Plan is unconfirmable because it impermissibly provides for releases and a permanent injunction for the partners of the Debtor and CNA, contrary to the provisions of 11 U.S.C. §§ 524(e) and 1141(d)(1)(A). It asserts that if the Debtor were to rely on § 105 for such relief, it would be unwarranted because no extraordinary circumstances exist to merit such relief.

The Debtor and the Committee filed a response to the Objection. With respect to the claims analysis, the Debtor and the Committee assert that they made the decision not to analyze all of the claims but instead are leaving that job to the Creditor Trustee due to the complexity of the claims and because the Plan provides for an alternative dispute resolution for those claims. They are able to differentiate generally between vendor claims and potential insured claims. They assert that there was ample information given about these claims both in their description and for assessment of a payout. They further contend that the classes are not gerrymandered because claims will be treated as asserted by the claimant for voting purposes.

As to the injunction provisions, the Committee and the Debtor argue that an injunction is an appropriate application of § 105(a). Of particular importance, they contend, is the fact that the beneficiaries of the releases are paying the primary consideration for the plan.

At the hearing on the Disclosure Statement, Objection and response thereto I questioned whether the treatment of Classes 3 and 4 met the requirements of *Granada Wines Inc. v. New England Teamsters and Trucking Indus. Pension Fund,* 748 F.2d 42 (1st Cir.1984). I also explained that I was troubled as to whether CNA and the former partners were entitled to the proposed injunction. Lastly, I raised the issue of whether the Debtor is entitled to a discharge based upon the language of 11 U.S.C. § 1143(d)(3). I gave the parties the opportunity to brief the issues.

After receiving these briefs, I held another hearing on the matter.[6] The Debtor

---

**4.** Go–Best has filed a claim against the Debtor in the approximate amount of $6.6 million dollars. The claim is based upon money which Go–Best loaned to Morris Goldings. It had not yet been finally determined that Go–Best is in fact a creditor of the Debtor. There was a question as to whether Go–Best has standing to file an objection. Since I raised the issues regarding the confirmability of the Plan *sua sponte,* the question remains before me regardless of Go–Best's standing.

**5.** Another argument in opposition is that the Disclosure Statement fails to address the unsecured claim which the trustee in the Morris Goldings case filed. Counsel to the Debtor represented that it did not believe that the Goldings's trustee intended to pursue the claim.

**6.** CNA submitted a brief in support of the Disclosure Statement and Plan but did not attend the hearing. In the brief, CNA explained that the Policy is a "wasting policy" such that all claim expenses are deducted form the available funds. It further explained that it requires the injunction to protect it from future lawsuits related to the Debtor and

explained at the hearing that it was prepared to offer amendments to the Disclosure Statement which would provide for a noncontingent partner contribution of $200,000 and a denial of a discharge unless the Debtor were to show that it engaged in new business activities within 18 months after confirmation of the Plan. The Debtor offered, however, that the issue of the discharge was largely irrelevant.

The Debtor also explained that it did not intend to alter the injunction and classification provisions. It argued that the partners are entitled to a permanent injunction because they are releasing their defense and indemnification rights with respect to the Policy. With respect to the classification, the Debtor represented that because the claimants are identifiable third party beneficiaries, their claims have a legal distinction from the trade creditors that warrants placing them in a separate class. Lastly, the Debtor explained that although the Plan is a liquidating one, there is chance that the partners will rejoin the Debtor in the future. Therefore, the Debtor is willing to forgo a discharge now but requests the opportunity to petition for one if it decides to regroup in the future.

At the hearing, the Committee represented that the Disclosure Statement and Plan represent an arms-length agreement which was reached by the Committee, Debtor and CNA. It predicted that the vast majority of creditors will support the Plan. In its view, the issue of separate classification had evolved into one of disparate treatment but that such treatment is proper because those who were covered by the Policy can benefit from its coverage and those who were not, cannot. It argued that the proceeds of the Property

cannot be property of the estate and the cases to which Go–Best cites are inapplicable.

Go–Best stated that the issue of the discharge was not irrelevant. It explained that the Debtor is no longer operating and does not contemplate any more work by virtue of their representation that they only have one employee who is recovering accounts receivable. Because a determination of eligibility for a discharge should be made upon confirmation, Go–Best argued that such a determination eighteen months after confirmation violates the Bankruptcy Code.

With respect to separate classification, Go–Best argued that the fact that the Class 3 claimholders would have had recourse to payment from an insurance policy pre-petition is an insufficient distinction for classification purposes. In support, Go–Best explained that the law in the First Circuit is that insurance proceeds are property of the estate. With respect to the releases and injunction, Go–Best argued that they violate the Code and the applicable case law.

After this hearing, I took the matter under advisement.

## IV. *Analysis*

### A. *Standards for Approving a Disclosure Statement*

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written

that the partners need also to be released since they could turn around and assert claims against CNA. Absent such protection, it argued, it would be unwilling to compromise with the Debtor and the resulting litigation costs would absorb the proceeds of the Policy.

disclosure statement approved, after notice and a hearing, by the court as containing adequate information.

11 U.S.C. § 1125(b).

"Adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan....

11 U.S.C. § 1125(a)(1).

■ I agree with the Debtor and the Committee that information provided in the Disclosure Statement, much of it quoted above, meets the requirements of 11 U.S.C. 1125(a)(1). Go–Best, however, also questioned whether the Plan can be confirmed given the provisions for separate classification of claims, third party releases and injunctions, and discharge of the Debtor. While these are issues for the hearing on confirmation, I find it appropriate to rule upon them now. As Judge Queenan explained, "[i]t is permissible ... for the court to pass upon confirmation issues where, as here, it is contended that the plan is so fatally and obviously flawed that confirmation is impossible." *In re Bjolmes Realty Trust*, 134 B.R. 1000, 1002 (Bankr. D.Mass.1991). *See also In re Phoenix Petroleum*, 278 B.R. 385, 394 (Bankr.E.D.Pa. 2001) ("Courts generally have agreed that it may, on occasion, be appropriate to consider issues at the disclosure hearing stage which could otherwise be raised at confirmation, if the described plan is fatally flawed so that confirmation would not be possible... "); *In re O'Leary*, 183 B.R. 338, 338–39 (Bankr.D.Mass.1995) ("Courts may refuse to approve disclosure state-

ments that describe plans that cannot be confirmed.").

### B. Separate Classification of Claims

■ The First Circuit has cautioned that the "general rule regarding classification is that 'all creditors of equal rank with claims against the same property should be placed in the same class.'" *Granada Wines, Inc., v. New England Teamsters and Trucking Industry Pension Fund*, 748 F.2d 42 (1st Cir.1984). It ruled that "[s]eparate classifications for unsecured creditors are only justified 'where the legal character of their claims is such as to accord them a status different from the other unsecured creditors....'" *Id.* at 46.

■ In this case, the Debtor, the Committee and CNA argue that because only the Class 3 creditors are entitled to be compensated from the proceeds of the Policy, the legal character of their claims warrants separately classifying their claims. Go–Best contends that because the proceeds of the Policy have now become property of the estate, the claims of the Class 3 creditors are no different from the claims of the Class 4 creditors and that both sets of unsecured creditors should be placed in the same class.

In support of their contention that the proceeds of the Policy are not property of the estate, the Debtor and the Committee rely upon cases which involve Directors and Officers insurance rather than liability insurance. *Pintlar Corp. v. Fidelity and Casualty Co. (In re Pintlar Corp.)*, 124 F.3d 1310 (9th Cir.1997); *Ochs v. Lipson (In re First Central Fin. Corp.)*, 238 B.R. 9 (Bankr.E.D.N.Y.1999); and *In re CyberMedica*, 280 B.R. 12, 17 (Bankr.D.Mass. 2002). These cases are not relevant because they address Directors and Officers insurance and not liability insurance.[7]

---

**7.** In *In re CyberMedica*, 280 B.R. 12 (Bankr. D.Mass.2002), Judge Rosenthal considered

More importantly, those cases do not provide any grounds by which I can ignore the plain language of *Tringali v. Hathaway Machinery Co., Inc.,* 796 F.2d 553 (1st Cir.1986), upon which Go–Best primarily relies. In that case, the debtor filed for relief after an employee received a $1,000,000 judgment against it for injuries. The lower court granted the employee relief from the automatic stay to obtain the proceeds of the debtor's $500,000 liability policy. The debtor appealed the order and in reversing the court below, the First Circuit wrote:

> Tringali argues that the proceeds of liability insurance are not even subject to the 'automatic stay,' for they are not 'property of the estate.' 11 U.S.C. § 541(a)(1) (1982 & Supp. II 1984). This fact, in its view, means the Bankruptcy Code did not prohibit its planned journey to the state court in the first place; the lifting of the stay was therefore irrelevant; and we should dismiss the appeal, perhaps as moot. We do not agree with the initial premise of this argument, however, for language, authority, and reason all indicate that proceeds of a liability insurance policy are 'property of the estate.' ... *The language of § 541 is broad enough to cover an interest in liability insurance, namely, the debtor's right to have the insurance company pay money to satisfy one kind of debt—debts accrued through, for example, the insured's negligent behavior.*

796 F.2d at 560 (emphasis added).

There is only one insurer in this case. Although the Debtor represented that it has not filed objections to claims, the total of the claims listed in the Claims Register Report vastly exceeds the payment offered by CNA. The Policy is a liability policy. These facts, in essence, are no different from those in *Tringali.* Contrary to the assertion of the Committee, under these facts the First Circuit held that the proceeds of a liability policy are estate property. 796 F.2d at 560. I am constrained to follow *Tringali* and hold that the proceeds of the Policy are property of the estate.

■ This holding, however, is not dispositive of the issue of separate classification. After holding that the proceeds of a liability policy were property of the estate, the First Circuit went on to state that what comes into the estate from such a policy is a "debtor's right to have the insurance company pay money to satisfy one kind of debt—debts accrued through, for example, the insured's negligent behavior." 796 F.2d at 560. It was not suggesting that the proceeds of a liability policy become part of the general fund available for distribution to all creditors.

The Debtor's interest in the proceeds of the Policy is precisely that identified in *Tringali.* The malpractice claimants have the right to receive some property of the estate that general unsecured creditors cannot receive. They are, in effect, multiple secured creditors having claims against a single fund. Separately classifying their claims does not violate *Granada Wines.*

The other cases from this district to which the parties cited do not persuade me to hold otherwise. This past summer, Judge Rosenthal had occasion to consider

whether former corporate directors were entitled to relief from stay to obtain payment from a corporate Directors & Officers insurance policy to cover their litigation costs. He wrote that such insurance "[u]nlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D & O policy. It is insured indirectly for its indemnification obligations." *Id.* at 17. I agree with the Debtor and the Committee that this case is not relevant to proceeds of a liability policy.

the issue of separate classification in *In re National/Northway Limited Partnership*, 279 B.R. 17 (Bankr.D.Mass.2002). He first concluded that he could not permit separate classification of a non-recourse deficiency claim arising under 11 U.S.C. § 1111(b). With respect to the creditor who was unsecured as to the debtor but had a security interest in non-debtor property, the debtor argued that the claim was of a different nature so as to warrant separate classification, citing to a Ninth Circuit case. Judge Rosenthal concluded that such reliance was unsupportable given that the First Circuit has a stricter test for separate classification. He continued:

> Moreover, while the Debtor criticized LaSalle for ignoring [*In re*] *Johnston*[, 21 F.3d 323 (9th Cir.1994)] [the Ninth Circuit case], the Debtor ignores *In re Thornwood*, 161 B.R. 367 (Bankr. M.D.Pa.), *aff'd* 162 B.R. 438 (M.D.Pa. 1993). In that case the court refused separate classification of an unsecured claim which was also guaranteed by the debtor's principal. '[T]he focus of claim classification requirements should be upon the nature of the creditor's claims 'as it relates to the assets of the debtor.' *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 670 (Bankr. D.D.C.1992) (emphasis added); *see also* [*In re*] *Greystone III* [*Joint Venture*], 948 F.2d [134] at 134 [(5th Cir.1991)].' *Thorwood* [*Thornwood*], 161 B.R. at 370. Moreover, even *Bjolmes*, which the Debtor urges this Court to adopt with respect to Lasalle's claim, stated that the presence of a personal guarantee is insufficient to meet the *Granada Wines* test. *Bjolmes*, 134 B.R. at 1003. If the existence of a personal guarantee, which provides the creditor a means to collecting payment not available to other unsecured creditors, does not affect the legal nature of the guaranteed claim, the existence of another means of collecting payment, albeit in the form of a mortgage, should also not affect the legal nature of the unsecured claim.

*Id.* at 30.

The plan before the court in *In re Salem Suede, Inc.*, 219 B.R. 922 (Bankr.D.Mass. 1998), placed both the secured and the unsecured claims of the judgment creditors into one class separate from the class for general unsecured creditors. In ruling that this classification violated *Granada Wines*, Judge Feeney stated that "[a]lthough the Judgment Creditors' claims against the Debtors arose in a different fashion from other unsecured and trade debt, their unsecured claims are of a legal character indistinguishable from that debt, and, therefore, the Debtors' separate classification of the Judgment Creditors' unsecured claims violates 11 U.S.C. § 1129(a)(1)." *Id.* at 933.

Neither one of these cases, however, included as property of the estate insurance proceeds which were only available to one set of creditors. The separate classification is appropriate.

## C. Permanent Injunction and Third Party Releases

The second issue to consider is the proposed releases and injunction in favor of non-debtors.

A court may confirm a plan only if it complies with the applicable title provisions. 11 U.S.C. § 1129(a)(1). The sections of the Code which are applicable to the issue under consideration are 11 U.S.C. § 524(e), stating that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt;" § 524(g), which contains detailed provisions for an injunction in a chapter 11 plan addressing damages for asbestos exposure; and Fed. R. Bankr.P. 7001(a)

which provides that an adversary proceeding must be filed to obtain an injunction "except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for the relief. . . ." Another rule provides

> *Notice of Hearing on Confirmation When Plan Provides for an Injunction.* If a plan provides for an injunction against conduct not otherwise enjoined under the Code, the notice required under Rule 2002(b)(2) shall:
>
> (A) include in conspicuous language (bold, italic or underlined text) a Statement that the plan proposes an injunction;
>
> (B) describe briefly the nature of the injunction; and
>
> (C) identify the entities that would be subject to the injunction.

Fed. R. Bankr.P.2002(b)(3).

Three circuits have held that § 524(e) prohibits approval of third party releases and injunctions. *Resorts International, Inc., v. Lowenschuss,* 67 F.3d 1394, 1401 (9th Cir.1995) ("this court has repeatedly held, without exception, that § 524(e) precludes bankruptcy courts from discharging the liabilities of non-debtors."); *Feld v. Zale Corp., (In re Zale Corp.),* 62 F.3d 746, 761 (5th Cir.1995) ("Accordingly, because the permanent injunction as entered improperly discharged a potential debt of CIGNA, a nondebtor, the bankruptcy court exceeded its powers under § 105."); *Landsing Diversified Props.-II v. First Nat'l Bank & Trust Co., (In re Western Real Estate Fund, Inc.),* 922 F.2d 592, 601 (10th Cir.1990), *modified sub nom., Abel v. West,* 932 F.2d 898 (10th Cir.1991) ("Not only does such a permanent injunction improperly insulate nondebtors in violation of section 524(e), it does so without any countervailing justification of debtor protection —— as discussed earlier, the discharge injunction provided for in section 524(a) already frees the debtor from potential de-

rivative claims, such as indemnification or subrogation, that might arise from the creditor's post-confirmation attempts to recover the discharged debts from others.").

Other courts conclude that the quoted statutory and rules provisions merely explain the effect of a debtor's discharge and do not explicitly prohibit such injunctions. *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648, 657 (6th Cir.), *cert. denied,* —— U.S. ——, 123 S.Ct. 85, 154 L.Ed.2d 21 (2002). Pursuant to 11 U.S.C. § 105, they allow such injunctions under special circumstances. *See e.g. id.* at 658 ("Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.' "); *In re Specialty Equip. Cos., Inc.,* 3 F.3d 1043 (7th Cir.1993); *Securities and Exchange Commission v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.),* 960 F.2d 285, 293 (2nd Cir.1992); *Menard–Sanford v. Mabey (In re A.H. Robins Co.),* 880 F.2d 694, 702 (4th Cir.1989); *Greenblatt v. Richard Potasky Jeweler Inc. (In re Richard Potasky Jeweler, Inc.),* 222 B.R. 816, 825 (S.D.Ohio 1998) ("Therefore, where a permanent injunction, regardless of the identity of its direct beneficiary, serves to protect the property or facilitate the administration of the debtor's estate, § 524(e) will not stand in the way of the court issuing the injunction.").

In order to determine whether such circumstances exist, these courts will look to the following factors:

(1) [A]n identity of interests between the debtor and the third-party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against he debtor or will deplete the assets of the estate;

(2) The non-debtor has contributed substantial assets to the reorganization;

(3) The injunction is essential to the reorganization . . . . ;

(4) A substantial majority of the creditors agree to such injunction, specifically, the impacted class, or classes, has 'overwhelmingly' voted to accept the proposed plan treatment;

(5) The plan provides a mechanism for the payment of all, or substantially all, of the claims of the class or classes affected by the injunction.

*In re Master Mtg. Inv. Fund, Inc.*, 168 B.R. 930, 935 (Bankr.W.D. Mo.1994).

The First Circuit has identified but not ruled on this issue. *See Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 983–84 (1st Cir.1995). In the lower court case, Judge Queenan confirmed the plan of Monarch Capital Corporation which contained releases for a number of non-debtors including attorneys. *Id.* at 976. Postconfirmation, Monarch Life Insurance Co., the wholly-owned subsidiary, sued Ropes & Gray for malpractice. The defendant argued, and the bankruptcy court agreed, that Monarch Life violated the injunction contained in the confirmed plan. Monarch Life urged on appeal that the bankruptcy court lacked the jurisdiction to enter such injunctions. The First Circuit ruled that Monarch Life was estopped to argue about the Bankruptcy Court's jurisdiction as it had never appealed the order of confirmation. The court did not rule on the propriety of the injunction but rather addressed it as follows:

Though there is conflicting authority on the 'jurisdictional' reach of section 105(a), the confirmation order cited precedent for a broad-based 'incidental' injunctive provision . . . We express no view on the soundness of the precedents cited in the confirmation order, nor on

their applicability to the particular Plan proposed by Monarch Life.

65 F.3d at 983.

The First Circuit had earlier addressed injunctions covering a nondebtor issued under § 105(a) during the course of the bankruptcy. The court stated

As authority for the injunction, the bankruptcy court relied upon its power to 'issue any order, process or judgment that is necessary or appropriate to carry out the provision of [Title 11].' 11 U.S.C. § 105(a). This grant of equitable power is not unlimited. 'While 11 U.S.C. § 105(a) does grant the bankruptcy court broad powers to issue any order 'necessary or appropriate to carry out the provisions of this title,' it is an extraordinary exercise of discretion to use that power to stay a third party action not involving the debtor.' *In re Brentano's Inc.*, 36 B.R. 90, 92 (S.D.N.Y. 1984). In the ordinary case involving an injunction against a third party action, there must be some effect on the debtor's estate stemming from the action before there is bankruptcy court jurisdiction to enjoin it.

*In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991).

In *In re Salem Suede, Inc.*, 219 B.R. 922 (Bankr.D.Mass.1998). Judge Feeney had to consider whether to confirm a plan which provided releases for the insurer/plan funder and various insiders of the debtor. Certain creditors had obtained prepetition judgments against the debtor. Those judgments were partially secured by real estate attachments. The issue of the whether the creditors' losses were covered by the debtor's insurance was being litigated in an adversary proceeding as was the issue of whether the insurer was liable to the creditors under Massachusetts consumer protection law. The plan proposed to pay the consenting judgment

creditors 100% of their outstanding claims in exchange for a release against the insurer and the policy holders. The court denied confirmation for a variety of reasons including its conclusion that the non-debtor discharges were unwarranted. *Id.* at 936. Judge Feeney concluded that even if injunctions were permissible under the Code, they were not appropriate in her case because none of the factors which the *Master Mortgage* decision articulated were present. *Id.* at 937.

In *In Re Boston Harbor Marina Co.,* 157 B.R. 726, 730 (Bankr.D.Mass.1993), Judge Queenan stated that "[t]he statutory prohibition against discharge of third parties may nevertheless not apply in certain circumstances." He sustained the objection to the confirmation of the plan, in part, because the requested injunctive relief was improper given that the recipients "are contributing nothing to the plan." *Id.* at 732. As explained above, however, Judge Queenan subsequently approved a plan which contained third party releases.

Other jurisdictions have issued cases which are instructive. In *Greenblatt v. Richard Potasky Jeweler, Inc. (In Richard Potasky Jeweler, Inc.),* 222 B.R. 816 (S.D.Ohio 1998), a consignment vendor sued the debtor and officers, directors or employees of the debtor for, *inter alia,* fraud and misrepresentation. *Id.* at 819. The Debtor filed lawsuits to enjoin the action. The bankruptcy court entered orders enjoining the vendor's actions. The district court reviewed the case law and first concluded that § 524(g) does not prevent issuance of an injunction. It further ruled that § 105 could be used as support for an injunction so long as it is "directly connected to the property or the administration of the debtor's estate." *Id.* at 826. It found that "a common thread can be discerned running through all of these unusual circumstances—all are either con-

nected to the property or to the administration of the debtor's estate." *Id.* The court held that "[l]itigating a peripheral matter in another forum, no matter how burdensome to the individuals involved or how frivolous the lawsuit, does not rise to the level of immediacy or directness that is required." *Id.* at 827–28.

The court in *Master Mortgage* also came to the conclusion that § 524(e) does not prevent the issuance of third party releases/injunctions. The court relied upon the plain language of the statute and different circumstances then present which were not present when restrictive courts decided the issue. 168 B.R. at 936. After coming to that conclusion, however, "[t]he Court cautions the Gentle Reader that a permanent injunction is a rare thing, indeed, and only upon a showing of exceptional circumstances in which the factors outlined above are present will this Court even entertain the possibility of a permanent injunction." *Id.* at 937.

The Supreme Court and the First Circuit have repeatedly pronounced that the plain meaning of the Bankruptcy Code must be observed. *Pioneer Inv. Serv. Co. v. Brunswick Assoc.,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993); *Martin v. Bajgar (In re Bajgar),* 104 F.3d 495, 497 (1st Cir.1997) ("As we have stated previously, the task of interpretation being with the text of the statute itself, and statutory language must be accorded its ordinary meaning.") (Internal quotations omitted). 11 U.S.C. § 524(e) does not specifically prohibit the injunctions which the Debtor is seeking in this case. That section only describes the parameters of a discharge order.

■ The provisions of § 524(g) do not require me to conclude otherwise. That section applies to third party injunctions in asbestos cases and nothing more. Indeed, were other provisions the deciding factor,

the bankruptcy rules regarding injunctions would argue in favor of the relief the Debtor seeks. I conclude that injunctive relief protecting non-debtor third parties may be appropriate depending upon the circumstances of the case.

■ Section § 105(a) gives me the authority to issue any order that is appropriate or necessary to carry out the Plan. The First Circuit has cautioned, however, that using this section to enjoin a non-debtor third party involves an extraordinary exercise of discretion. *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir.1991). I will adopt and use the multi-factor test summarized in *Master Mortgage* as set forth above to determine the necessity for such an injunction because it examines all of the applicable considerations for determining such relief.

### 1. CNA

■ CNA represents in its brief that it would "be unwilling to contribute to finding [sic] the plan absent protection from potential post-confirmation lawsuits arising from their prepetition relationship with the Debtor.... To obtain this protection, CNA needs direct protection, in the form of the direct third party release, and indirect protection, in the form of releases for the partners of the Debtor." CNA Brief, p. 9 [8] CNA argues that absent releases, there would be protracted litigation over the merits of each claim and that such litigation would likely absorb the proceeds of the policy. Go–Best appears to object to the release of CNA not so much as it applies to Class 3 creditors but as it relates to Class 4 creditors because, it argues, the Class 4 creditors would not receive any consideration from the CNA payment for the benefit of Class 3 claimants.

The first factor considered in the multipart test is whether there is an identity of interest between the Debtor and CNA so that a suit against CNA is essentially a suit against the Debtor or will deplete the assets of the estate. Under *Tringali*, the Debtor's right to have CNA pay money to satisfy debts accrued through Goldings' negligent behavior is property of the estate and is subject to the automatic stay. Moreover, to the extent that CNA has paid over the limits of the policy to the Creditors' Trust, its obligations under the contract have terminated. A suit against CNA is neither a suit against the Debtor nor will such a suit deplete the assets of the estate.

The second factor is whether CNA has contributed substantial assets to the Plan. While arguably this is the case, it is not as persuasive because CNA is only fulfilling its contractual obligation to the Debtor.

The third factor is whether the injunction is essential to the reorganization.[9] CNA contends that it will only fund the reorganization so long as it receives the injunction. Given my conclusion regarding the proceeds of the Policy, CNA can no longer take this posture. CNA must turn over the estate assets notwithstanding its perceived need for an injunction.

With respect to the fourth factor, whether the affected classes have voted in favor

---

**8.** The footnote referenced at the end of the quoted sentence did not exist in the pleading.

**9.** The Plan is a liquidating plan. Some cases hold that third party injunctions are inappropriate in such cases. *In re Swallen's, Inc.*, 210 B.R. 123 (Bankr.S.D.Ohio 1997); *In re Optical Technologies, Inc.*, 216 B.R. 989 (Bankr.M.D.Fla.1997). *Contra, sub silentio, Abel v. Shugrue (In re Ionosphere Clubs, Inc.)*, 184 B.R. 648 (S.D.N.Y.1995). Because I find that the injunctions would be unsuitable in the present case, I need not address the broader issue.

of the Plan, the Court only has the Debtor and Committee representations that the Plan will have substantial approval. Go–Best rightly points out that although Class 4 is affected by the provisions, they will receive no consideration from the payment from CNA to the Class 3 creditors. With respect to the fifth factor, whether the Plan provides a mechanism for the payment of all or substantially all of the claims of the class or classes affected by the injunction, that does not appear to be the case given the range of payment for Class 3 is 24 –100% and the range for Class 4 is 3–17%.

CNA has not met any of the factors necessary to warrant the issuance of a permanent injunction. Therefore, I hold that the Plan would be unconfirmable since it contains this provision.

### 2. The Partners

■■■ The Debtor and Committee contend that the Partners are entitled to releases because of their contribution of $200,000 per partner and their release of claims to be indemnified and defended under the Policy. The effect of the partner contributions, they contend is that the claims against the Policy are reduced, the amount to general unsecured creditors is greatly increased and only with these releases will CNA fund the Plan. Go–Best contends that the financial consideration is insufficient and that the release consideration does not benefit the Class 4 creditors.

In applying the multi-factor test to decide whether the injunction is proper, the first factor is whether there is an identity of interest between the Debtor and the Partners such that a suit against the Partners is essentially a suit against the Debtor or will deplete the assets of the estate.

To analyze this factor requires a review of a limited liability partnership.

There is little case law in Massachusetts on the liability of individual partners in a limited liability partnership.[10] *Dow v. Donovan*, 150 F.Supp.2d 249, 255 (D.Mass. 2001), involved a discrimination claim of a former law firm associate for termination after having been denied elevation to the partnership. Judge Keeton explained that he had before him a case of first impression for Massachusetts on the issue of individual partner liability in a limited liability partnership. He described the individual partners' liability as follows:

> The Limited Liability Partnership was set up to allow limited liability partners to protect non-partnership assets against liability for the wrongs of the partnership under certain conditions . . . In a Limited Liability Partnership, limited liability partners cannot be vicariously liable for the torts of the partnership. The liability of each depends on proof of some wrongful act or omission by that individual partner. This statute does not mean that partners in a Limited Liability Partnership can *never* be liable in a discrimination suit. It means that the plaintiff must demonstrate that the individual partner was negligent or committed some other kind of wrongful act, error, or omission that produced discrimination against the plaintiff.

*Id.* at 267–68.

A suit against a partner is not suit against the Debtor. The partners have not asserted indemnification rights against the Debtor which would be satisfied out of the policy.

The second factor is whether the Partners have contributed substantial assets to the Plan. The Debtor represented that the Partners are now prepared to contribute

10. The limited liability partnership statute is found at Mass. Gen. Laws ch. 108A, § 15.

$200,000 per person and to assign their individual rights under the Policy to the Debtor and to release CNA. Go–Best contends that the individual contribution of $200,000 per partner is not a substantial contribution.

The amount is a small percentage of what is to be distributed from the Plan although it is the significant asset to fund the distribution to Class 4 creditors. There is no information about whether the contribution is significant in terms of what the partners are able to pay. *See e.g. Keck, Mahin & Cate*, 241 B.R. 583, 592–95 (Bankr.N.D.Ill.1999) (considering a number of different factors used); *Greer v. Gaston & Snow (In re Gaston & Snow)*, 1996 WL 694421 (S.D.N.Y.1996) (settlement amounts arrived at after looking at formulas).[11]

The third factor is whether the injunction is essential to the reorganization. The Debtor, CNA and Committee contend that the injunction is essential to the reorgani-

zation because absent such a provision, CNA will not fund the Plan. However, this is a liquidating plan; there will be no reorganization.

With respect to the fourth factor, I have the representation from the Debtor and the Committee that the creditors support the Plan and a vigorous objection of a possible creditor who will be affected by the provision. The partner contributions provide consideration to Class 4 but, as Go–Best rightly points out, it is unclear if the consideration is sufficient given that there is no information as to how that amount was calculated. With respect to the fifth factor, the Plan does not provided for payment of all or substantially all of the classes affected by the injunction.

The First Circuit cautioned that injunctions involve extraordinary exercise of discretion. Because the partners have not resoundingly demonstrated that they have met the *Master Mortgage* tests, there is insufficient evidence to warrant such an

---

**11.** In *Boston Harbor Marina*, the debtor asked the court to look to professional partnership cases when considering the issue of approving releases and injunctions. Regarding this argument, Judge Queenan stated

> Beyond all this, the Debtor's reliance on decisions involving professional partnerships is misplaced. In a professional partnership case, contributions to the plan by individual partners often constitute the plan's prime funding. Typically, the funds available to creditors from the net worth of the professional partner far exceeds anything creditors might recover from the partnership itself. It usually makes sense in these cases, moreover, for creditors to shun collection actions against the individual partners. Doing so avoids the extraordinary expense of multiple lawsuits, as well as the ultimate bankruptcies of many individual partners which would likely ensue and make only liquidation values available. And the partners can derive funds for the plan contributions from their future compensation, which is typically at high levels, funds which would not become as-

sets of their bankruptcy estates. It is usually considered advisable to issue a temporary injunction against creditors suing those partners who are cooperating in the reorganizational effort, in order to preserve those partners as sources of funding pending agreement with the creditors' committee on a plan.... Certainly a factor favoring continuation [of an injunction post-confirmation] would be the court's conclusion that creditors derive a benefit from the partners' contributions which at least equals whatever creditors would be likely to get from pursuit of remedies against the individual partners.... Indeed, because a chapter 7 trustee of the partnership may proceed against the partners individually, 11 U.S.C. § 723 (1988), the best-interest-of-creditors test under section 1129(a)(7)(A)(I) requires the court to find that creditors will receive at least as much from the partners' contributions to the plan as they would from the assertion of a chapter 7 trustee's rights against the partners.

157 B.R. at 731–32.

exercise of discretion in this case. *In re G.S.F. Corp.*, 938 F.2d 1467, 1474 (1st Cir. 1991). Therefore, I cannot approve a plan with such provisions without more.

### D. The Discharge

 The final issue is whether the Debtor is entitled to the discharge as provided in the Disclosure Statement and Plan. With respect to a liquidating debtor in Chapter 11, the Code provides that:

> The confirmation of a plan does not discharge a debtor if—
>
> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
>
> (B) the debtor does not engage in business after consummation of the plan; and
>
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a cased under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

At the final hearing of this matter, the Debtor represented that it would agree to be denied a discharge unless the partners of the Debtor were to establish that within eighteen months after the effective date of the Plan they engaged in business.

In *In re Wood Family Interests, Ltd.*, 135 B.R. 407 (Bankr.D.Colo.1989), the debtor proposed a reorganization plan which provided that the debtor would turn over its assets to the secured lender. The court did not confirm the liquidating plan, in part, because it provided for the discharge of the undersecured claim in contravention with 11 U.S.C. § 1141(d)(3).

In this case, the Plan provides for the liquidation of the property of the estate. The Debtor would be denied a discharge under 11 U.S.C. § 727(a) because it is not an individual. The remaining prong of § 1141(d)(3) is whether the Debtor will engage in business after consummation of the plan.

The Code does not define consummation, only substantial consummation.[12] Given that all of the property under the plan will transfer to the trust and commencement of distribution will occur shortly thereafter, substantial consummation will occur shortly after the effective date of the Plan. If consummation is something short of substantial consummation, consummation should occur even sooner. That being the case, I must consider whether the Debtor will engage in business after consummation.

The business of the Debtor ceased over a year ago. The partners who made up the Debtor have moved on to other firms or their own practices and are not practicing together. Although counsel to the Debtor represented that the former partners would like the opportunity to perhaps reunite, he gave no indication about when and how that would happen. Therefore, I cannot conclude that the Debtor will engage in business after the consummation of the plan.

The Debtor proposed that it not receive a discharge now but could receive the same were it to demonstrate that it engaged in business within eighteen months after the confirmation. This proposal is

---

12. Substantial consummation is defined as "substantial consummation" means—
(A) transfer of all or substantially all of the property proposed by the plan to be transferred;
(B) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and
(C) commencement of distribution under the plan.
11 U.S.C. § 1101(2).

untenable for a variety of reasons. Section 1141 speaks of the effect of confirmation of the plan. It requires that the court decide the issues upon confirmation and not eighteen months after confirmation. Lastly, such a ruling would contravene the provisions and purpose of the Code which require expeditious processing of reorganizations. Despite the possible desires of those partners who might want to reunite, I am unable to grant their request.

Any plan of reorganization for the Debtor which provides that the Debtor will be granted a discharge cannot be confirmed.

## V. *Conclusion*

For the reasons set forth above the Plan, as described in the Disclosure Statement, cannot be confirmed. As such, I will enter an order denying the motion to approve the Disclosure Statement.